**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| PAUL MULHOLLAND, Plaintiff, | : | Civil Action No. ______ |
| v. | : | **COMPLAINT** |
| DONALD EMIL VOLLENWEIDER, D&E MEDIA, LLC, and JOHN DOES 1-10, | : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |

## INTRODUCTION

1. Plaintiff ("Mulholland") brings this action against Donald Emil Vollenweider ("Vollenweider"), D&E Media, LLC ("D&E Media"), and John Does 1-10 (collectively, "Defendants"), under the provisions of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), for cyberpiracy against an individual under 15 U.S.C. § 8131, and related claims for defamation and false light invasion of privacy under New Jersey common law.

2. Defendant D&E Media, LLC is a New Jersey pornography studio that operates under the brand "Facial Abuse" and has been credibly accused of abusing its performers and ignoring adult industry consent standards.

3. It has targeted Mulholland, an investigative journalist, since he began investigating their abusive practices in 2021.

4. Defendants retaliated against Mulholland by registering a series of domain names bearing his name and using them to publish false, defamatory, and derogatory content about him, to impersonate him, and to divert internet users away from his legitimate journalism.

5. After a Uniform Domain Name Dispute Resolution Policy ("UDRP") panel ordered the transfer of the disputed domain names to Mr. Mulholland, Defendants promptly re-registered

the same defamatory content under a new set of nearly identical domain names — this time inserting an extra letter, "e", into Mr. Mulholland's name — and resumed their campaign.

6. Therefore, Mr. Mulholland seeks recourse for Defendants' bad-faith registration and use of numerous internet domain names that are identical or confusingly similar to Plaintiff's name and common-law trademark, PAUL MULHOLLAND, and the false and defamatory content Defendants have published at those domain names and elsewhere online.

7. Plaintiff seeks injunctive relief, transfer of the offending domain names, statutory and compensatory damages, punitive damages, and attorneys' fees and costs.

**JURISDICTION**

8. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331 and 1338(a) and (b), because this action arises under the federal question addressed in the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.

9. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims as to form part of the same case or controversy.

10. Personal jurisdiction exists over the Defendants because Vollenweider resides in New Jersey, D&E Media, LLC maintains its principal place of business in New Jersey, and Defendants committed the alleged tortious acts in New Jersey.

**VENUE**

11. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District, and a substantial part of the events giving rise to the claims, and the harm to Plaintiff, occurred in this District.

## PARTIES

12. Plaintiff Paul Mulholland is an individual residing in College Park, Maryland. Mr. Mulholland is an investigative journalist who has reported and published under his name PAUL MULHOLLAND since at least 2017.

13. Defendant Donald Emil Vollenweider is an individual residing at 345 Fox Chase Lane, Chester, New Jersey 07930. Upon information and belief, Vollenweider is a director, officer, member, and/or agent of Defendant D&E Media, LLC and directed, authorized, or participated in the acts alleged herein.

14. Defendant D&E Media, LLC is a limited liability company that maintains its principal place of business at 360 Glenwood Avenue, Suite 6B, East Orange, New Jersey 07017. Upon information and belief, D&E Media operates a pornography studio and related websites under the brand "Facial Abuse."

15. Defendants John Does 1-10 are individuals or entities whose true identities are presently unknown to Plaintiff and who, upon information and belief, registered, controlled, authored content for, or otherwise participated in the registration and use of the domain names and the publication of the defamatory content alleged herein. Plaintiff will seek leave to amend to state their true names when ascertained.

## FACTS

### A. <u>Plaintiff and His PAUL MULHOLLAND Mark</u>

16. Mr. Mulholland is a reporter, writer, and investigative journalist who has written extensively across numerous fields. He has used his personal name, PAUL MULHOLLAND, continuously and prominently as a journalist since at least as early as 2017, including by publishing his work on his Medium page, located at <paulm989.medium.com>.

17. Mr. Mulholland's reporting has appeared in many outlets over nearly a decade.

18. From 2019, he wrote as a full-time reporter for DC Witness, an online publication covering homicide court proceedings in Washington, D.C., where he authored approximately 150 stories.

19. He also wrote for the independent outlet Arc Digital, where one article on abortion ethics received approximately 25,000 views and another on incitement to violence received approximately 4,500 views.

20. He has also published investigative work on his personal blog, including an investigation of an abusive apartment building in College Park, Maryland that received several thousand views.

21. Beginning in 2021, Mr. Mulholland worked as an independent videographer for News2Share, filming widely covered public events. By early 2022, he had filmed the trucker-convoy protest in Ottawa, published footage of the January 6 attack on the United States Capitol, and filmed a related protest in Maryland. His January 6 footage credits "Paul Mulholland" and has received over three thousand views online.

22. In September 2022, Mr. Mulholland was hired by Institutional Shareholder Services ("ISS") as lead policy reporter in Washington, D.C. for its publications *Plansponsor*, *Planadviser*, and *Chief Investment Officer*, covering retirement and financial policy for an audience of HR professionals, financial advisers, asset managers, and regulatory compliance staff. His reporting addressed the SECURE 2.0 Act and the Department of Labor's Retirement Security Rule proposal, among other policy matters.

23. In August 2024, Mr. Mulholland was recruited by the American Retirement Association to write for its publications (PSCA, NAPA, and ASPPA). His reporting on the Retirement Fairness Act reached a wide audience, with some articles exceeding 10,000 views, and

he was the first journalist to report that the Act had retroactive effect, which a rival trade publication subsequently reported on. He also first reported the Department of Labor's December 2024 launch of a tool which helps people find 401(k)s from previous jobs.

24. Mr. Mulholland's journalism, published under the PAUL MULHOLLAND name, has also been recognized by independent media outlets that have featured his reporting.

25. For example, he appeared as a guest on the Off Beat podcast, which has approximately 122,000 subscribers on YouTube, in an episode viewed approximately 178,000 times.

26. He also appeared on PNG Media News, which has approximately 10,000 subscribers on YouTube, in an episode viewed approximately 5,600 times.

27. That independent outlets and commentators invoke the PAUL MULHOLLAND name as an audience draw confirms that the name is recognized by the public and the press as identifying Mr. Mulholland as the source of his journalistic work.

28. Mr. Mulholland maintains his own website at paulmulholland.com, which presents him as "Paul Mulholland | Investigative Journalist."

29. Through this extensive and continuous use of his name in commerce as a journalist, and the public recognition his reporting has earned, Mr. Mulholland has acquired common-law trademark rights in the mark PAUL MULHOLLAND in connection with news reporting and journalism. His name and mark are distinctive and identify Mr. Mulholland as the source of his journalistic work.

30. As a widely published investigative journalist who has been writing since at least early 2017, the PAUL MULHOLLAND mark has developed secondary meaning.

31. Mr. Mulholland acquired these rights and established the distinctiveness of his name and mark long before Defendants registered and used the domain names referenced here.

32. Beginning in 2021, Mr. Mulholland investigated D&E Media, LLC and its "Facial Abuse" brand. Based on accounts from former female models, his reporting revealed that the studio disregarded performers' withdrawal of consent during filming, ignored safe words and other signals that consent had been withdrawn, and continued filming while performers were subjected to physical acts that injured them — including being slapped black and blue and choked to the point of vomiting.

33. His reporting further documented that these practices fell below consent and safety standards observed elsewhere in the adult-film industry, and that the studio's practices inflicted lasting physical and psychological harm on its models.

34. Mr. Mulholland also reported that D&E Media harassed, intimidated, surveilled, and retaliated against its critics and former performers, including by publishing defamatory content and registering domain names bearing their names. His investigative article concerning the company was published on July 5, 2023. As of the filing of the UDRP complaint, it had received approximately 132,000 clicks and 90,000 reads on Medium.

35. During Mr. Mulholland's reporting in 2022, a director of D&E Media published ("doxxed") the address and first name of Mr. Mulholland's mother and sister on an adult-content forum, in order to harass and intimidate Mr. Mulholland and to deter him from publishing his reporting.

**B. <u>Defendants' Registration and Use of the Original Domain Names</u>**

36. On or about April 22–23, 2022, Defendants registered five domain names: <paulmulholland.com> on April 22, 2022, and <paulmulholland.net>, <paulmulholland.org>, <paulmulholland.biz>, and <paulmulholland.info> on April 23, 2022.

37. On or about February 20, 2025, Defendants registered the domain name <paulm989medium.com>, which mimics the URL of Mr. Mulholland's own Medium page, <paulm989.medium.com>. This site is where his article concerning D&E Media is published.

38. On or about April 7, 2025, Defendants registered the domain name <paulmulhollandjournalist.com>, which adds only the descriptive word "journalist" to the PAUL MULHOLLAND mark.

39. On or about May 2, 2025, Defendants registered the domain name <paulmulhollandfacialabuse.com>, which adds the words "facial abuse" — the D&E Media brand that is the subject of Mr. Mulholland's reporting — to the PAUL MULHOLLAND mark.

40. The domain names identified above (collectively, the "Original Domain Names") were registered through the registrar CNOBIN Information Technology Limited. Each of the Original Domain Names is identical or confusingly similar to Plaintiff's PAUL MULHOLLAND name and mark, and each was registered long after Mr. Mulholland acquired rights in that name and mark.

41. That defendants chose Mulholland's name and impersonated him under his byline to divert his audience, itself suggests that the name identifies him as the source of his work. This is further evidence of secondary meaning.

42. Defendants used the Original Domain Names to publish false and defamatory content about Mr. Mulholland, to impersonate him, to tarnish his name and mark, and to divert internet users searching for Mr. Mulholland and his journalism to Defendants' websites.

43. Defendants have no trademark or other rights in, and are not commonly known by, any of the Original Domain Names. They have also made no legitimate noncommercial or fair use of them. Defendants registered and used the Original Domain Names with a bad-faith intent to profit from Plaintiff's name and mark.

**C. The UDRP Proceeding and Transfer Order**

44. On or about January 16, 2026, Mr. Mulholland commenced a proceeding under the UDRP before the National Arbitration Forum (FORUM), challenging Defendants' registration and use of the Original Domain Names.

45. On February 25, 2026, the Panel found that the Original Domain Names are identical or confusingly similar to Mr. Mulholland's PAUL MULHOLLAND mark; that Defendants had no rights or legitimate interests in the domain names; and that Defendants registered and used the Original Domain Names in bad faith. The Panel ordered all of the Original Domain Names be transferred to Mr. Mulholland.

46. The Original Domain Names were transferred to Mr. Mulholland on or about March 23, 2026, and are now registered to and controlled by him.

**D. Defendants' Post-Transfer Re-Registration and Renewed Campaign**

47. Rather than cease their conduct, Defendants responded to the UDRP decision by registering, on or about March 10–11, 2026, a new set of virtually identical domain names that merely insert an extra letter "e" into Mr. Mulholland's name: <paulemulholland.com>, <paulemulholland.net>, <paulemulholland.org>, <paulemulholland.info>,

<paulemulhollandjournalist.com>, <paulem989medium.com>, <paulemulhollandfacialabuse.com>, and <paulemulholland.biz> (the "Post-Transfer Domain Names," and together with the Original Domain Names, the "Domain Names"). Each of the Post-Transfer Domain Names was registered through the registrar NICENIC International Group Co., Limited, using a privacy-protection service to conceal the registrant's identity.

48. Each of the Post-Transfer Domain Names is identical or confusingly similar to Plaintiff's PAUL MULHOLLAND name and mark. Defendants used the Post-Transfer Domain Names to republish the same defamatory content that they had published at the Original Domain Names, and to continue to impersonate, tarnish, and divert traffic from Mr. Mulholland.

49. Defendants published articles at the Post-Transfer Domain Names under a false byline attributing the articles to "Paul Mulholland" himself, falsely representing that he authored the stories.

50. The registration and hosting details for each of the Domain Names — including the registrar, creation date, registrant privacy service, name servers, and hosting information — are documented in publicly available WHOIS records and DomainTools domain reports. These records reflect that the Post-Transfer Domain Names share a common registrar, privacy service, and hosting infrastructure, further demonstrating that they were registered and are controlled by the same party.

51. Defendants have no trademark or other rights in any of the Post-Transfer Domain Names and have made no bona fide or legitimate noncommercial or fair use of them.

52. Defendants are not commonly known by any of the Post-Transfer Domain Names.

53. Defendants registered and used the Domain Names with the intent to profit from Mr. Mulholland's name and mark. Defendants have a documented pattern of making critical,

defamatory websites with the names of those who have criticized D&E Media. Defendants have asked another public critic of its practices—adult performer Felicity Feline—to perform scenes and even represent the company at adult industry conferences in exchange for taking down a domain, <felicityfeline.com>, which hosts several of her videos and is written to suggest she enjoyed the experience of shooting them, in spite of her criticisms of the company.

54. Defendants have attempted to dissuade Mr. Mulholland's reporting through other means. Upon information and belief, Defendant has asked Plaintiff to write marketing copy for D&E Media websites to incentivize him to stop his reporting.

## E. Defendants' False and Defamatory Statements

55. At the Domain Names, and at the related website <adultfyi.com>, Defendants have published false statements of fact about Mr. Mulholland, presented as fact, for at least a year and a half. Defendants republished on or about March 10-11, 2026 these false statements at the Post-Transfer Domain Names and published substantially the same statements at <adultfyi.com>. Upon information and belief, Defendants backdated at least one of the <Adultfyi.com> articles, "Paul Mulholland Accused of Exploiting Models for Personal Gain", at <https://adultfyi.com/creepy-paul-mulholland-fake-journalist-stalker-2/>. That article, purportedly dated March 18, 2025, references an allegation based on an exchange on X (formerly Twitter) that occurred in May of 2025, and according to the Wayback Machine, did not exist until sometime in July 2026.

56. Defendants did not seek comment from Mr. Mulholland prior to publication of any of these articles.

57. The republication of these allegations at the Post-Transfer Domain Names on or about March 10–11, 2026 renews and continues the harassment campaign against Mulholland. Such republication constitutes a material and substantive change to the relevant articles.

58. Among other things, Defendants have falsely stated, as fact, that Mr. Mulholland:

(a) is "an employee of Facial Abuse" ("Paul Mulholland Accused of Exploiting Models for Personal Gain," Adult FYI);

(b) fabricates stories and makes "posts under the identities of other people" ("Paul Mulholland Accused of Exploiting Models for Personal Gain," Adult FYI);

(c) pursues women in the adult industry "for his own sexual gratification" and uses purported advocacy "as bait" ("Paul Mulholland Accused of Exploiting Models for Personal Gain," Adult FYI);

(i) similar claims are made in an article on <paulem989medium.com>, republished on March 10-11, 2026, which claims Paul has "contacted women he claims to want to 'save'", that his "focus appears to fixate selectively on certain women, raising the question of whether his outrage stems from genuine concern or from a desire for validation, credibility, or social access within the activist space," and describes his advocacy as "leveraging perceived empathy for status, access, or ideological gain."

(d) "plants the idea of pursuing false accusations" in order to obtain "a lucrative settlement" ("Paul Mulholland Accused of Exploiting Models for Personal Gain," Adult FYI);

(e) is a "creeper" and "stalker" ("Paul Mulholland: Creeper, Stalker, Manlet", <paulemulholland.com>, published Jan. 21, 2026); and

(f) is an "admitted porn addict" whose journalism is a pretext for predatory conduct. ("Paul Mulholland Accused of Exploiting Models for Personal Gain," Adult FYI).

(i) Substantially similar allegations are made in "Paul Mulholland: A Manufactured Crusader?", <paulem989medium.com>, published January 17, 2026, which calls the adult industry one Paul "had, by his own admission, once enjoyed as a consumer," and claims "his initial interest in the adult industry was based on personal consumption."

(g) endorses and advocates extremist and political violence, including the targeted murder of corporate executives, and casual antisemitism. ("The Self-Made Martyr: Paul Mulholland's Descent into Extremism and Credibility Collapse," <paulemulholland.org>). This content was republished on the newly registered <paulemulholland.org> domain on March 10, 2026. Other statements in the article include:

(i) "Murdering CEOs is direct action. It is corporate sabotage. If you're going to do it, make sure it's targeted, organized, and makes a political statement.";

(ii) "Mulholland has moved beyond bias, beyond sensationalism, and into outright endorsement of extremist, violent rhetoric.";

(iii) "Let that sink in: a man claiming to be a journalist publicly supports messaging that advocates targeted killings of business leaders."; and

(iv) "His endorsement of murder, and casual antisemitism disqualifies him from being considered a serious voice in journalism."

(h) is a leader among "the lowest of the low" and "the fake journalists, failed content creators, and desperate attention-seekers," a "snake on a webcam" who exploits his journalism to obtain personal contact with adult performers ("Paul Mulholland Journalist," paulemulholland.net). This content was republished on the newly registered

<paulemulholland.net> domain on March 11, 2026. The website also includes the following statements:

(i) "And Paul Mulholland found his crowd among these people. Not the good or noble, but the lowest of the low. The fake journalists, failed content creators, and desperate attention-seekers. He didn't just join them; he became their leader, a snake on a webcam."; and

(ii) "Over time, he becomes someone who concocts schemes to gain attention, status, and even personal contact with pornstars he himself has found while enjoying the product."

(i) spreads "misinformation and bullshit" online as a "clout-chaser" to elevate his status and gain sexual access to adult performers ("Paul Mulholland: Fake Journalist, Real Gooner," paulemulholland.net). The title of the story, associating Mr. Mulholland with an online subculture of compulsive masturbators, is itself defamatory. This content was republished on the newly registered <paulemulholland.net> domain on March 11, 2026. The website also includes the following statements:

(i) that Mulholland "spews his misinformation and bullshit across the internet in order to make himself feel better, and to attempt to raise his own status to get access to the hot, sexual type of pornstars he is attracted to"; and

(ii) "These aren't the actions of someone who cares, this is what you do when you're a clout-chaser who has a personal interest in some of the models after admittedly watching the content himself for pleasure."

(j) is antisemitic ("Paul Mulholland – Anti Semite," paulemulholland.com). This content was first published January 21, 2026 and republished on the newly registered

paulemulholland.com domain on March 11, 2026. The page depicts Mulholland through an AI-generated image of a man resembling him in dark clerical garb, holding a flaming torch and pointing aggressively, before a stone building bearing a Hebrew inscription, with an Israeli flag visible in the crowd. A screenshot of the website is below:




59. This harassment campaign has continued since at least early 2025. Earlier stories on Adult FYI have claimed that Paul:

(a) corners his sources and threatens "to expose the personal details they entrusted to him unless they agree to his demands, which often include sexual favors";

(b) engages in "blackmail"; and

(c) is a "stalker" who conducts "invasive interviews" to collect personal information he later uses as "ammunition" against his sources.

60. All of these statements are false.

61. They are defamatory *per se* because they falsely impute to Mr. Mulholland the commission of serious crimes, serious sexual misconduct, and conduct incompatible with the integrity essential to his profession as a journalist.

62. These statements would also be highly offensive to a reasonable person.

63. Defendants published these statements with actual malice — that is, with knowledge that they were false or with reckless disregard for their falsity.

64. Defendants were the subject of Mr. Mulholland's investigation, and upon information and belief, published these stories as a form of retaliation to protect their business.

(a) Mr. Mulholland's reporting directly threatens D&E Media's source of revenue; pornographic videos sold to subscribers. Prospective performers who encounter Mulholland's investigative article may decline to work with the studio, depriving Defendants of content.

(b) Defendants registered the Domain Names and published the associated content to eliminate that threat by discrediting Mr. Mulholland. Defendant's scheme is designed to discourage former models, who might otherwise corroborate Plaintiff's reporting from cooperating with him. The <adultfyi.com/contact> page even solicits information from individuals who have been "contacted by creepy Paul Mulholland".

(c) Defendants fabricated false accusations against Mr. Mulholland and published them on websites bearing his name, so that the fabrications would surface when anyone searched for him. Upon information and belief, this was done to discredit Mr. Mulholland, to hinder his investigative work of D&E Media, and to discourage others from exposing D&E Media's practices, among other reasons.

(d) Mr. Mulholland is not alone: many other critics of D&E Media have been targeted with similar retaliatory websites.

(e) One such example is adult performer Felicity Feline. After performing in two scenes for "Facial Abuse" in 2015 and another for a different D&E website, she has

criticized Defendants in several online interviews. Felicity is also an on-the-record source in Mr. Mulholland's story on Defendants. She became the subject of a website, <felicityfeline.com>, which shows her "Facial Abuse" scenes, and claims to "debunk" her "libel" by showing an interview conducted after one of her shoots for the website. The site impersonates Felicity Feline and is written as if she is the author, much like the Domain Name websites impersonate Paul Mulholland. As reported by Mr. Mulholland, Defendants sought to "blackmail" her, claiming they would take down the defamatory website if she was willing to represent "Facial Abuse" as a model at adult industry conventions. Defendants also asked Feline to perform another scene for "Facial Abuse," without monetary payment, in exchange for taking down the site. The <felicityfeline.com> website also links to one of the defamatory stories about Plaintiff, through a hyperlink labeled an "**Important Adult Industry Safety Alert!!!**"

(f) Defendants took deliberate steps to conceal their authorship of the offending content — omitting any attribution, contact information, or sourcing from the articles, and shielding their identities in the domain registrations. Even though Defendants deny their authorship of many of the critical websites, the one criticizing Felicity Feline, <felicityfeline.com> (which includes several of her scenes) links to the legal compliance statement for "Facial Abuse" and D&E Media, indicating common ownership. That site also links to one of the Adult FYI articles targeting Mr. Mulholland. Upon information and belief, as stated above, Defendants also backdated the defamatory articles. One Adult FYI article dated March 18, 2025, references an allegation based on an exchange on X (formerly Twitter) that occurred in May of 2025, and according to the Wayback Machine, did not exist until sometime in July 2026.

## F. Harm to Plaintiff

65. Defendants' acts are willful and undertaken with the deliberate intent to trade on, tarnish, and destroy the goodwill and reputation associated with Mr. Mulholland's name and mark, to impersonate him, to divert internet users away from his journalism, and to deter his sources.

66. Defendants' acts have caused, and unless enjoined will continue to cause, immediate and irreparable harm to Mr. Mulholland and to his reputation, goodwill, and livelihood.

67. Defendants have used the Domain Names to, *inter alia*, bury Mr. Mulholland's legitimate journalism beneath a network of imposter sites bearing his name; to divert internet users searching for him and his work; and to deter sources from communicating with him about his reporting on D&E Media.

68. The false statements impute serious criminal and sexual misconduct to Mr. Mulholland and attack the professional integrity on which his career as a journalist depends. Defendants' conduct has also caused distress to Mr. Mulholland and his family, whose personal information Defendants exposed in the course of the same retaliatory campaign.

(a) **Suppression and diversion in search results.** A private browser Google search for "paul mulholland journalist," conducted on September 23, 2026, returns Defendants' imposter sites intermixed with Mr. Mulholland's legitimate profiles on the very first pages of results. These imposter results appear alongside, and compete directly with, Mr. Mulholland's authentic presence — his LinkedIn profile, his own site at <paulmulholland.com> identifying him as an "Investigative Journalist," and his Muck Rack portfolio — thereby diverting internet users searching for him and burying his legitimate journalism beneath Defendants' fabricated content. At least four of the Domain

Names appear among those top results, each displayed with a disparaging title and snippet designed to discredit him:

(i) **<paulemulholland.info>** — "Paul Mulholland Information | The double-sided advocate . . ."

(ii) **<paulemulholland.org>** — headed by his name and asserting that his "online conduct increasingly paints a different picture" than that of a "neutral truth-seeker."

(iii) **<paulemulhollandjournalist.com>** — "Paul Mulholland – Journalist? Activist?"

(iv) **<paulemulholland.com>** — "Paul Mulholland Activist Cosplaying Journalism."

(b) **Amplification through AI-generated search summaries.** The diversion and suppression described above are compounded by Google's AI-powered search features.

(i) These features ingest Defendants' fabricated content and repeat it as though it were neutral fact. A private-browsing Google search for "paul mulholland journalist," conducted using Google's "AI Mode" on September 29, 2026, generates an AI-written summary presented at the very top of the results, above the ordinary links, that purports to describe Mr. Mulholland and his journalism.

(ii) That summary draws upon and repeats the content of Defendants' imposter site at <paulemulhollandjournalist.com> and treats the article published there, titled "Paul Mulholland – Journalist? Activist?", as a principal source on Mr. Mulholland's work and questioning his reporting methods and his purported activism.

(iii) The same imposter site appears among the AI summary's cited source cards, bearing a publication date of August 9, 2026. An image of the AI summary is below:




(iv) As a result, Defendants' fabrications are no longer merely listed among the search results a reader must evaluate; they are synthesized into, and presented as, an ostensibly impartial, authoritative answer that a reader researching Mr. Mulholland encounters first. In this way, the AI summary launders Defendants' discrediting narrative, further magnifying the reputational harm, the diversion of internet users away from Mr. Mulholland's legitimate journalism, and the deterrence of his sources.

(c) **Interference with his newsgathering.** Upon information and belief, potential sources who encounter Defendants' fabricated content decline to cooperate; on multiple occasions, sources have failed to appear for scheduled calls, repeatedly postponed

meetings, and gone silent. Mr. Mulholland has been unable to pursue a follow-up report based on at least seven sources who came forward with accounts of abuses by Defendants.

(d) **Professional constraint and lost opportunity.** Upon information and belief, Defendants' campaign has caused Mr. Mulholland to be passed over for employment opportunities and has strained relations with current and past employers who do not wish to be associated with Defendants' smear campaign.

## COUNT ONE
## Cybersquatting
## (15 U.S.C. § 1125(d))

69. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

70. Plaintiff owns rights in the PAUL MULHOLLAND mark, which is distinctive, and was so at the time Defendants registered each of the Domain Names.

71. Defendants registered, trafficked in, and used the Domain Names, each of which is identical or confusingly similar to Plaintiff's PAUL MULHOLLAND mark.

72. Defendants registered, trafficked in, and used the Domain Names with a bad-faith intent to profit from Plaintiff's mark. Among other things, upon information and belief:

(a) Defendants have no trademark or other intellectual property rights in the Domain Names;

(b) the Domain Names do not consist of the legal name of, and are not commonly used to identify, any Defendant;

(c) Defendants made no non-infringing commercial use, or legitimate noncommercial or fair use, of the Domain Names;

(d) Defendants intended to divert internet users searching for Plaintiff and his journalism to Defendants' websites, for commercial gain and with the intent to tarnish and

disparage Plaintiff's name and mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of those websites;

(e) Defendants registered multiple domain names that they knew were identical or confusingly similar to Plaintiff's distinctive mark;

(f) Defendants re-registered the Post-Transfer Domain Names, and resumed their conduct, after a UDRP panel had ordered transfer of the Original Domain Names on a finding of bad faith; and

(g) Defendants used the Domain Names to host false and defamatory content and to impersonate Plaintiff.

73. Defendants' conduct is directly and proximately causing substantial, immediate, and irreparable harm to Plaintiff, and to his goodwill and reputation, and will continue to do so unless enjoined. Plaintiff has no adequate remedy at law.

74. Plaintiff is entitled to injunctive relief, including transfer of the Domain Names, pursuant to 15 U.S.C. §§ 1116 and 1125(d)(1)(C); to recover Defendants' profits, actual damages, and costs under 15 U.S.C. § 1117(a), or, at Plaintiff's election, statutory damages of up to $100,000 per Domain Name under 15 U.S.C. § 1117(d); and to recover attorneys' fees as an exceptional case under 15 U.S.C. § 1117(a).

## **COUNT TWO**
## **Cyberpiracy Protection for Individuals**
## **(15 U.S.C. § 8131)**

75. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

76. Each of the Domain Names consists of, or is substantially and confusingly similar to, the name of Mr. Mulholland, a living person. Mr. Mulholland uses his name both as his personal name and as a source of his professional and business identity.

77. Defendants registered the Domain Names without Mr. Mulholland's consent.

78. Upon information and belief, Defendants registered the Domain Names with the intent to profit from Mr. Mulholland's name, including by seeking to obtain financial or other advantage through the sale or transfer of the Domain Names and/or by trading on and exploiting the value of his name, as set forth above.

79. Defendants did not register the Domain Names in good faith in connection with any work of authorship, and no exception under 15 U.S.C. § 8131(1)(B) applies.

80. Plaintiff is entitled to injunctive relief, including the forfeiture, cancellation, or transfer of the Domain Names to Plaintiff, and to an award of costs and attorneys' fees, pursuant to 15 U.S.C. § 8131(2).

## COUNT THREE
## Defamation
## (New Jersey Common Law)

81. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

82. Defendants published, to third parties, false statements of fact concerning Mr. Mulholland, including the statements set forth above.

83. The statements are false, were understood by those who read them as statements of fact concerning Mr. Mulholland and are reasonably susceptible of a defamatory meaning.

84. The statements are defamatory per se because they falsely impute to Mr. Mulholland the commission of serious crimes, serious sexual misconduct, and conduct incompatible with his profession as a journalist.

85. Defendants published the statements with actual malice; knowledge of their falsity or reckless disregard for whether they were true or false. Defendants also intended to harm Mr. Mulholland's reputation.

86. Defendants' publication of the same defamatory content at the Post-Transfer Domain Names, after the UDRP transfer order, constitutes a republication of the statements.

87. The statements are not privileged and are not statements of protected opinion; they assert and imply provable facts about Mr. Mulholland.

88. As a direct and proximate result of Defendants' defamation, Mr. Mulholland has suffered, and continues to suffer, harm to his reputation, harm to his profession and livelihood, and emotional distress. Because the statements are defamatory per se, damages are presumed.

89. Defendants' conduct was willful, malicious, and undertaken in reckless and wanton disregard of Mr. Mulholland's rights, entitling Mr. Mulholland to punitive damages.

**COUNT FOUR**
**False Light**
**(New Jersey Common Law)**

90. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

91. Defendants published false statements of fact concerning Mr. Mulholland, including the statements set forth above, which depicted him in a false light.

92. The statements are false and were understood by those who read them as statements of fact concerning Mr. Mulholland.

93. The false light in which Mr. Mulholland was placed, namely that he has committed serious crimes, engaged in serious sexual misconduct, and engaged in conduct incompatible with his profession as a journalist, would be highly offensive to a reasonable person.

94. Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Mr. Mulholland would be placed by their publications.

95. The statements are not privileged and are not statements of protected opinion; they assert and imply provable facts about Mr. Mulholland.

96. Defendants' publication of the same content at the Post-Transfer Domain Names, after the UDRP transfer order, constitutes a republication of statements placing Mr. Mulholland in a false light.

97. The false light in which Mr. Mulholland was placed has caused harm to his reputation, harm to his profession and livelihood, and caused emotional distress.

98. Defendants' conduct was willful, malicious, and undertaken in reckless and wanton disregard of Mr. Mulholland's rights, entitling Mr. Mulholland to punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

1. Declaring that Defendants have violated Section 43(d) of the Lanham Act (15 U.S.C. § 1125(d)) and 15 U.S.C. § 8131, and have defamed Plaintiff and placed him in a false light under New Jersey law;

2. Ordering Defendants, within ten (10) days of the entry of judgment, to transfer to Plaintiff the registrations of the Domain Names and of any other domain names owned or controlled by Defendants that are identical or confusingly similar to the PAUL MULHOLLAND name and mark (collectively, the "Prohibited Domain Names"), and ordering the relevant registrar(s), upon Plaintiff's request, to transfer the Prohibited Domain Names to Plaintiff, pursuant to 15 U.S.C. §§ 1116, 1125(d)(1)(C), and 8131(2);

3. Preliminarily and permanently enjoining Defendants, and all those in active concert or participation with them, from (a) registering, trafficking in, using, or transferring any of the Prohibited Domain Names; (b) registering or using any domain name or other source identifier that is identical or confusingly similar to the PAUL MULHOLLAND name and mark; (c)

impersonating Plaintiff or publishing content under his name or byline; and (d) publishing the false and defamatory statements identified herein or any substantially similar statements, and directing Defendants to remove all such content;

4. Awarding Plaintiff, at Plaintiff's election, either (a) Defendants' profits, Plaintiff's actual damages (enhanced as permitted by law), and the costs of the action under 15 U.S.C. § 1117(a), or (b) statutory damages of up to One Hundred Thousand Dollars ($100,000) per Domain Name under 15 U.S.C. § 1117(d);

5. Awarding Plaintiff compensatory and presumed damages on his defamation and false light claims in an amount to be determined at trial;

6. Awarding Plaintiff punitive damages on his defamation and false light claims;

7. Declaring this an exceptional case and awarding Plaintiff his reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1117(a) and 8131(2);

8. Awarding Plaintiff pre-judgment and post-judgment interest; and

9. Awarding Plaintiff such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 15, 2026

Respectfully submitted,
LEWIS & LIN, LLC

/s/ Brett E. Lewis

Brett E. Lewis (pro hac vice pending)
Abraham Moussako
77 Sands Street, 6th Floor
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326
Brett@iLawco.com
Abraham@iLawco.com
*Attorneys for Plaintiff Paul Mulholland*